UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNETTE WEDDLE,

      Plaintiff,

                                    Case No. 1:23-cv-714

v.

                                    Hon. Hala Y. Jarbou

DEWITT CHARTER TOWNSHIP, et al.,

      Defendants.

_____/

## OPINION

This is a civil rights action under 42 U.S.C. § 1983 against police officer Andrew Steven Wiswasser, DeWitt Charter Township, and the DeWitt Police Department. Plaintiff Lynette Weddle asserts that Defendants violated her constitutional rights. Before the Court is Defendants' motion to dismiss the complaint for failure to state a claim (ECF No. 7). For the reasons herein, the Court will grant the motion in part and deny it in part.

## I. BACKGROUND

The following facts are taken from the complaint (ECF No. 1) and Officer Wiswasser's body camera video (ECF No. 8-2). On January 26, 2022, Weddle "was the victim of a domestic violence assault[.]" (Compl. ¶ 8.) She fled the scene of the incident in her car and called 911. (*Id.*) As she was driving, she spotted a police car parked on the side of the road. (*Id.* ¶ 9.) She told the 911 operator that she was going to seek assistance from the officer inside the vehicle and then she pulled over next to him to ask for help. (*Id.* ¶ 10.)

As Weddle pulled up and parked, Wiswasser "exited his vehicle with his gun drawn on" her. (*Id.* ¶ 11.) Weddle tried to explain the situation to him. Even though Wiswasser was

"familiar" with Weddle and knew that she was fleeing a domestic violence situation, he kept his gun drawn on her.  (*Id.* ¶¶ 13, 17, 18.)

The body camera footage captures most of their interaction.  In the footage, Wiswasser exited his cruiser shortly after Weddle drove up and parked parallel to Wiswasser's vehicle, with the left side of her car facing Wiswasser.  Through her open window on the driver's side, Weddle told Wiswasser that she was "on the phone with 911."  (Body Camera Video 00:31.)  She was holding her cellphone in her right hand.  He asked, "Well, yeah, why aren't you pulling over for them?"  She responded that she wanted to "press" (i.e., press charges), but she did not finish her sentence.  While speaking, she opened her driver-side door partway.  Wiswasser stopped her from exiting, asking, "What are you doing?"  He told her to "settle down" and then pushed her door closed with both hands.  She told him, "Yeah, but you don't jump out your gun with me like that."  He responded, "When you come pulling up on me like that, I certainly will."  His firearm is not visible in the video.

Weddle, still seated in her car with her cellphone in one hand, proceeded to tell him that she was out having dinner with "Charles Baker, Jr." and that she was "going to be honest" with Wiswasser; she consumed "a beer" that she "didn't even finish."  (*Id.* at 01:01.)  She said that Baker "got mad" at her after she asked him to take her to her truck because he was "drinking, drinking."  (*Id.* at 01:15.)

Weddle was wearing a winter coat.  While talking, she reached behind her toward her right coat pocket with her right hand and then brought her hand forward again.  She then reached into her left coat pocket and retrieved what appears to be a clear plastic container of food and another cellphone.  She explained to Wiswasser that she was "just reaching into [her] pockets to show [him] evidence," and then she set these items on the front passenger seat to her right.  (*Id.* at 01:22.)

2

Weddle reached into her left coat pocket again and retrieved what appears to be a small handbag or wallet.  At that point, Wiswasser told her, "Stop reaching in your pockets, get your hands up, get your hands out of your pockets, quit reaching in there." (*Id*. at 01:27.)  Weddle put the handbag or wallet on the seat next to her.

Wiswasser then told her to "just get out of the car" and opened her car door.  (*Id.* at 01:30-35.)   Weddle, holding her cell phone in her right hand, leaned forward a little and again reached into her left coat pocket with her left hand.  Wiswasser quickly reached forward and grabbed her left coat sleeve at the wrist, telling her in a raised voice to "get your hand out of your pocket!"  She told him, "Okay, but don't touch me, I pulled over for a reason," pulling out what appears to be a set of keys.  (*Id.* at 01:35.)  Wiswasser let go of her sleeve and told her to get out of her car.  At some point, Sergeant Crawford arrived at the scene.

Wiswasser repeated his demand that Weddle get out of her car and stop reaching into her pockets.  She replied, "Don't treat me . . .  Okay, I'll stop reaching into my pocket!"  He told her three more times to step out of her car.  She stayed seated and twice told the 911 operator to "send a state trooper here."  She then told Wiswasser that she did not have to get out her car.  While doing so, she put her left hand into her left coat pocket one more time.[1]  In response, Wiswasser lunged forward, grabbed her left wrist with one hand and her left elbow with the other, telling her, "Stop reaching in your pocket!"  (*Id.* at 01:35-1:50.)  He then pulled her out of her car by her left arm and pushed her toward a police vehicle.

As Weddle protested, Wiswasser stated, "I'm not playing games with you . . . I told you to stop reaching in your pockets." (*Id.* at 01:50-02:10.)  Weddle, still clutching her phone, asked the

---

[1] Although it happened quickly and the video is slightly blurry, close inspection of the video shows that Weddle clearly put her left hand into her pocket.  (Body Camera Video 01:49.)

3

911 operator for "help" as an officer (either Wiswasser or Crawford) grabbed her right arm and placed her in handcuffs.

Wiswasser's body camera became dislodged through contact with Weddle's shoulder or back while her arms were being secured.  (*Id*. at 02:02.)  However, Sergeant Crawford is visible in the video behind Weddle.  (*Id.* at 02:07-02:40.)  Crawford apparently checked the tension on Weddle's handcuffs after she complained, "Ouch, ouch, they're too tight!"  Crawford told her, "I know!  I'm fixing it."  (*Id*.)

After the handcuffs were in place, Weddle apparently complied with the officers' commands.  She allowed a female officer to pat her down.  (*Id.* at 02:40-03:30.)  The entire encounter from the time she pulled up to Wiswasser's vehicle to the time she was in handcuffs lasted less than two minutes.  Weddle alleges that Wiswasser "arrested her for resisting." (Compl. ¶ 15.)

Weddle filed this suit on June 29, 2023, raising two counts.  In Count I of her complaint, she asserts Fourth and Fourteenth Amendment violations, including: (1) violation of her right to be free from unreasonable search and seizure; (2) violation of her right to substantive due process; and (3) denial of equal protection.  In Count II, she asserts that Defendants inflicted cruel and unusual punishment, in violation of the Eighth Amendment.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) ("Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

At this stage, the Court's decision "rests primarily upon the allegations of the complaint[.]" *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008).  But the Court can also consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion . . .  so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

The Court can also consider video evidence, especially where the complaint relies on facts that "could only be known . . . by watching the video[.]" *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022).  In such cases, "it makes little sense to waste time and effort by ignoring the video['s] contents." *Id.*  However, that use is limited; "[i]f there is a factual dispute between parties, [the Court] can only rely on the video[] over the complaint to the degree the video[] [is] clear and 'blatantly contradict[s]' or 'utterly discredit[s]' the plaintiff's version of events." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### B. Qualified Immunity

Officer Wiswasser argues that he is entitled to qualified immunity.  An officer is entitled to qualified immunity and is shielded from damages and the burdens of suit "if his conduct does

not violate a clearly established statutory or constitutional right of which a reasonable official would have known." *Smith v. City of Troy*, 874 F.3d 938, 943 (6th Cir. 2017) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Determining an officer's "entitlement to qualified immunity" thus "involves a two-step inquiry."  *Smith*, 874 F.3d at 944.  First, the court must determine whether the facts alleged, judged in a light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right.  *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "If no constitutional right would have been violated on the facts alleged, the inquiry stops at that point and the officer is entitled to qualified immunity."  *Id.*

Second, "[i]f a violation can be made out . . . the court must determine whether the right at stake was clearly established."  *Id.*  "In making this determination, the court must rely on decisions from the United States Supreme Court, the Sixth Circuit Court of Appeals, or finally, the decision of other circuit courts."  *Id.* (citing *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993)).  "If either prong is not met, then the government officer is entitled to qualified immunity." *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018).  "Although 'a case directly on point' is not necessary to overcome qualified immunity, 'existing precedent must have placed the . . . constitutional question beyond debate.'"  *Linden v. City of Southfield*, 75 F.4th 597, 602 (6th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Once the defense is raised, the "plaintiff bears the burden of overcoming qualified immunity." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021).  That burden includes "pointing to legal authority that clearly shows that the constitutional question . . . should be resolved in [the plaintiff's] favor."  *Linden*, 75 F.4th at 604.

6

## III. ANALYSIS

### A. Unopposed Dismissal of Claims

Defendants move to dismiss all claims.  Weddle agrees that dismissal of some claims is warranted.

#### 1. Claims against DeWitt Police Department

Weddle agrees to dismiss her claims against the DeWitt Police Department because the police department is not a distinct legal entity capable of being sued.  *See Boykin v. Van Buren Twp.*, 479 F.3d 444, 450 (6th Cir. 2007) (concluding that Van Buren Township Police Department is not a separate entity capable of being sued).  Consequently, the Court will dismiss the police department as a defendant.

#### 2. Eighth Amendment Claim

Weddle also agrees to dismiss the Eighth Amendment claim because the Eighth Amendment only applies to convicted persons serving their sentences.  *See Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010).  It does not apply to Weddle.  Accordingly, the Court will dismiss that claim.

#### 3. Equal Protection claim

Weddle agrees to dismiss her equal protection claim.  Indeed, she has not alleged disparate treatment.  *See Wymer v. Richland Cnty. Child. Servs.*, 584 F. App'x 283, 284 (6th Cir. 2014) (dismissing equal protection claim where complaint failed to allege that similarly situated persons were treated differently from the plaintiffs).  The Court will dismiss this claim as well.

After dismissal of the foregoing, that leaves Weddle's substantive due process and excessive force claims against Wiswasser and DeWitt Charter Township.

## B. Substantive Due Process Claim

Weddle brings a claim under the "substantive component" of the Fourteenth Amendment's Due Process Clause, arguing that Wiswasser's conduct violated her "right to liberty, . . . includ[ing] personal safety and freedom from captivity."  (Compl. ¶ 21.)  Defendants argue that the Court should dismiss this claim because such claims are more appropriately analyzed under the Fourth Amendment.  The Court agrees.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court stated, in pertinent part,

> *[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Id*. at 395.

In other words, the Fourth Amendment standard applies here, not substantive due process. Weddle does not respond to this argument.  Thus, the Court will dismiss the substantive due process claim.

## C. Excessive Force Claim

The Fourth Amendment prohibits police officers from using excessive force when making arrests.  *Smith*, 874 F.3d at 943.  In determining whether an officer used excessive force, the Court asks whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [him] without regards to [his] underlying intent or motivations."  *Kent v. Oakland Cnty*, 810 F.3d 384, 390 (6th Cir. 2016) (citing *Graham*, 490 U.S. at 397) (internal quotation marks omitted).  The Court must evaluate each case in its own context, considering factors such as "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the

8

safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). This test evaluates the "reasonableness of the moment of the use of force as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vison of hindsight." *Kent*, 810 F.3d at 390 (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 320 (6th Cir. 2015) (quotation marks omitted)). The Court must account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "The ultimate question, however, is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Kent*, 810 F.3d at 390 (quoting *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005)).

As a preliminary matter, the Court must decide what evidence it can consider at this stage. As discussed above, on a Rule 12(b)(6) motion, a court may consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion." *Gavitt*, 835 F.3d at 640. The Court can also consider video evidence of the incident; however, the Court can credit that evidence only where it blatantly contradicts the facts alleged in the complaint. *See Bell*, 37 F.4th at 364. The Court may also consider "exhibits attached to the defendant's motion" so long as they are referred to in the complaint and are central to the plaintiff's claims. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001). Weddle has not attached any exhibits to her complaint; therefore, the question is whether the Court should consider the exhibits provided by Defendants without converting their motion into one for summary judgment. Defendants have attached a copy of Wiswasser's body camera video to their motion to

dismiss.  And when submitting their reply to Weddle's response, Defendants provided a copy of Wiswasser's police report.

The body camera video is clearly central to Weddle's claims because it shows the incident in question.  Also, Weddle expressly refers to it in her complaint.  (*See* Compl. ¶ 14.)  Therefore, it is appropriate to consider this video under Rule 12(b)(6).  However, to reiterate, the video can only be used to cast doubt upon the complaint to the extent the video "'blatantly contradict[s]" or 'utterly discredits[s]' the plaintiff's version of events."  *Bell*, 37 F.4th at 364 (quoting *Scott*, 550 U.S. at 380).  Otherwise, the Court must accept Weddle's allegations as true.  *Id.*

Defendants urge the Court to consider Officer Wiswasser's police report, which he prepared after Weddle's arrest.  (*See* Defs.' Reply Br. 2, ECF No. 16.)  In that report, he asserted that he was aware that Weddle had called 911 regarding a domestic violence incident and that she was driving in her vehicle while speaking to the 911 operator.  (Wiswasser Police Rep., ECF No. 16-1, PageID.187.)  He parked his cruiser in a location along her route in order to intercept her.  (*Id.*)  When he saw her vehicle approach, he observed that she was driving in excess of the speed limit.  (*Id.*)  He asserted that Weddle has "an assaultive past, and has been known to make irrational decisions without warning."  (*Id.*)  He unholstered his pistol because "the manner in which she pulled in [next to his car] was quick, abrupt, and aggressive."  (*Id.*)

Though Weddle does not attach the police report to her complaint, she refers to it in the complaint.  She does so to support her allegation that Wiswasser "was familiar with [Weddle] and had dealt with her in the past."  (Compl. ¶ 17.)  And she apparently relies on the report when alleging that Wiswasser "knew she was fleeing a domestically violent situation[.]"  (*Id.* ¶ 18.)  Thus, the report is referenced in the complaint.

In addition, the report is arguably central to Weddle's claim because it sheds light on what Wiswasser knew about Weddle and her circumstances before their interaction.  The reasonableness of his use of force depends, in part, on that knowledge.  Thus, the report potentially falls into the category of documents that the Court may consider without converting Defendants' motion to one for summary judgment.

On the other hand, "[w]hile documents integral to the complaint may be relied upon, even if they are not attached, . . . it must also be clear that there exist no material disputed issues of fact regarding the relevance of the document."  *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (quotation marks and citations omitted).  Here, it appears that there are, or will be, material disputed issues regarding some of the facts in the report.  Indeed, the report contains Wiswasser's self-serving description of the incident and his prior history with Weddle.  It would be inappropriate to credit his version of the facts when determining whether Weddle's complaint states a claim.

Furthermore, reliance on facts in the police report that are not in the complaint is particularly problematic here because Defendants first presented those facts in their reply to Weddle's response.  In doing so, they deprived her of the opportunity to respond to those issues.  For that reason, a reply brief is generally not the proper place to raise new arguments or evidence.  *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).  Accordingly, the Court will not rely on the police report when deciding Defendants' motion.  Instead, the Court will confine itself to the complaint and the body camera video.

### 1. Defendant Wiswasser

Weddle claims that Wiswasser used excessive force when he brandished his gun, pulled her from her car, and "physically assaulted" her.[2]  (Compl. ¶¶ 12-14.)  When "a plaintiff claims that excessive force was used multiple times, 'the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way.'"  *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (citing *Smith*, 874 F.3d at 944).  Therefore, the Court will evaluate each use of force in turn.

### (a) Brandishing the firearm

After Weddle pulled up next to Wiswasser, he "exited his vehicle with his gun drawn on [her]," and when she tried to explain herself, he "kept his gun drawn on [her]."   (Compl. ¶¶ 17-18.)  The video does not blatantly contradict these assertions.  Wiswasser's gun is not visible in the video, but neither are Wiswasser's hands until he pushed Weddle's door closed.  Also, in the video, he appears to acknowledge drawing his firearm on her.

As a general matter, "a police officer may approach a suspect with a weapon drawn during a [traffic] stop when the officer reasonably fears for his safety."  *Wright*, 962 F.3d at 865.  Conversely, "[a]n officer's decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain a claim of excessive force."  *Id.* at 866 (quoting *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) (collecting cases)).

Applying the *Graham* factors, none of them weigh in Wiswasser's favor at this stage.

*Severity of the crime.*  Construing the facts in Weddle's favor, Wiswasser drew his gun on Weddle shortly before or after she parked her car.  At that point in time, Wiswasser had no reason to suspect that Weddle had committed, or was about to commit, a crime.  Nothing in the complaint

---

[2] Plaintiff does not clarify in her complaint or her briefing what she means by the physical assault.

or the video suggests any illegal behavior by Weddle up to that point.  Accordingly, this factor weighs in Weddle's favor.

*Threat*.  Similarly, neither the complaint nor the video provide any justification for deeming Weddle to be a threat when she arrived.  Wiswasser argues that she "quickly drove up to" him.  (Def.'s Br. 12, ECF No. 8.)  However, neither the complaint nor the video provide support for that assertion.  To the contrary, the few seconds of Weddle's driving that are visible in the video show her driving up to Wiswasser in a slow and controlled manner, not in an aggressive or threatening one.  (*See* Body Camera Video 00:19-00:25.)  Furthermore, Wiswasser knew Weddle and the reason why she was approaching him.  He knew that she needed assistance; she was not an unknown stranger approaching him for no apparent reason.  Thus, this factor also supports Weddle.

*Resisting arrest*.  Weddle was not fleeing or resisting arrest when approaching Wiswasser and parking near him.  Wiswasser relies on the fact that Weddle did not comply with his commands to stop reaching in her pockets.  However, construing the video and the complaint in Weddle's favor, he drew his firearm on her *before* he issued any commands.  Thus, this factor also weighs in Weddle's favor.

In sum, all three *Graham* factors weigh in Weddle's favor at this stage.  And when considering the totality of the circumstances, Weddle has pleaded sufficient facts to state a claim that Wiswasser used excessive force when drawing his firearm on her.

Turning to the second step in the qualified immunity analysis, the right at issue was clearly established.  As early as 2020, "it was clearly established . . . that brandishing a firearm without a justifiable fear that [the plaintiff] was fleeing or dangerous was unreasonable and constituted excessive force." *Wright*, 962 F.3d at 870.  Construing the available facts in Weddle's favor, those are the circumstances here.

13

Defendants disagree, contending that Wiswasser's conduct was, at most, an "objectively reasonable mistake" entitling him to qualified immunity.  (Defs.' Reply Br. 4, ECF No. 16.) Defendants cite *Dorsey v. Barber*, 517 F.3d 389 (6th Cir. 2008), but that case is inapposite.  There, the officer had reason to believe the plaintiffs were suspects wanted by the highway safety patrol for an auto theft.  *Id.* at 391.  The officer did not know the seriousness of their crimes when he attempted to detain them, so he did not know the threat they posed.  *Id.* at 400.  After they twice disregarded his orders to stop, he pulled out his firearm to "stabilize the situation with a preemptive show of authority."  *Id.*  Because the plaintiffs were in a crowd of people, the officer's firm show of force appeared necessary to "minimize[e] the risk of harm."  *Id.* at 400.  Although the plaintiffs were two innocent men, the officer's actions were arguably justified under the circumstances.  *Id.* at 402.  In other words, his mistake was not "so egregious as to suggest outright incompetence." *Id.* at 400.  Rather, he "err[ed] on the side of public safety" because he did not know the seriousness of the offense at issue and the plaintiffs did not obey his orders to stop.  *Id.*

In contrast, the facts here do not suggest any risk of harm that would have required Wiswasser to draw his firearm on Weddle.  She was not suspected of a crime, let alone a serious one.  And she had not refused or failed to comply with Wiswasser's orders at that point in time. Thus, *Dorsey* is distinguishable.  Accordingly, at this stage of the case, Weddle is not entitled to qualified immunity for his use of his firearm.

### 2. Pulling Weddle from her car

Weddle also contends that Wiswasser used excessive force when he "forcibly removed her from her vehicle without any cause whatsoever."  (Compl. ¶ 14.)  In some circumstances, a police officer's use of force to remove an unarmed and non-threatening civilian from their vehicle may be excessive.  *See, e.g.*, *Folks v. Petitt*, 676 F. App'x 567, 571 (6th Cir. 2017) (holding that an officer who pulled a non-resisting, non-threatening suspect for a minor civil infraction from his

14

vehicle and "slammed" him against his back windshield used excessive force).  Although the plaintiff in *Folks* suffered physical injuries, the use of force need not be "life threatening" or "leave extensive marks . . . to be considered excessive." *Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1996).  "Indeed, courts have recognized excessive force claims in cases where the alleged use of force did not even involve physical contact." *Id.*

*Severity of the crime*.  The first *Graham* factor favors Weddle because, when construing the facts in her favor, there was little reason to believe she had committed a crime.  *See, e.g.*, *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (noting that the fact that the plaintiff had not committed a crime "clearly weighed against a finding of reasonableness").  Judging from the complaint and the video, her actions before she parked did not suggest she had committed a crime.

After Weddle parked, she did not comply with Wiswasser's orders to step out of the car or to refrain from reaching into her pockets, but those actions were not necessarily crimes.  She does allege that Wiswasser ultimately arrested her for resisting,[3] but she also contends that he removed her from her car "without any cause whatsoever[.]"  (Compl. ¶ 14.)  Indeed, it is not clear from the video or the complaint what grounds Wiswasser had to detain her.  If she was not under arrest or lawfully detained based on probable cause or reasonable suspicion of criminal conduct, she was not obligated to comply with his commands to step out of her car.  *See People v. Palacios*, No. 331909, 2017 WL 1967474, at *1-2 (Mich. Ct. App. May 11, 2017) (noting that failing to comply with a command to exit a vehicle can be obstruction under Mich. Comp. Laws § 750.81d(1), but the officer's command must be "lawful," i.e., in furtherance of a detention based

---

[3] Defendants contend that Weddle eventually pleaded guilty to an attempted violation of resisting and obstructing under Mich. Comp. Laws § 750.81d.  However, Defendants provide no evidence to support this assertion, let alone evidence that the Court can consider at this stage.

on probable cause or reasonable suspicion).  And at any rate, even if a criminal violation occurred, the seriousness of any such violation is minor.  Thus, the first factor weighs in Weddle's favor.

*Threat*.   Defendants argue that Wiswasser's actions were justified because Weddle repeatedly reached into her pockets despite commands to stop, which "posed an obvious risk to officer safety."  (Defs.' Br. 11.)  The video shows Wiswasser asking Weddle to not reach into her pockets at least three times.  Despite those commands, she continued reaching into her pockets.  But the possibility of a threat is low here because there are few facts from which to infer a risk of harm to Wiswasser.

On the one hand, "the remote risk that [a suspect] could have been armed does not establish that [she] posed a reasonable threat of danger."  *Browning v. Edmonson Cnty.*, 18 F.4th 516, 528 (6th Cir. 2021).  On the other hand, in several cases evaluating the use of force on a vehicle occupant, the Court of Appeals has considered it relevant to the threat analysis that the plaintiff appeared to reach for an unseen weapon.  For instance, in *Foos v. City of Delaware*, 492 F. App'x 582 (6th Cir. 2012), the Court of Appeals found the officers' use of a taser on the plaintiff was justified, in part, because they suspected the plaintiff had reached for a weapon when he reached toward the backseat of his vehicle.  *Id.* at 585, 591.  But there were other circumstances present that justified the officers' perception of a threat in that case.  At the time, the plaintiff was repeatedly accelerating his truck (which had crashed into a pillar), flailing his arms violently, and "otherwise behaving erratically and irrationally," which suggested the possibility of "hand-to-hand combat with recalcitrant individuals" that posed a "risk of serious injury" to the officers, in addition to the risk posed by the vehicle itself.  *Id.* at 589, 591.  In contrast, though Weddle had consumed alcohol and was driving while holding and talking on her cellphone (a potentially dangerous thing to do), she did not exhibit the level of erratic and dangerous behavior seen in *Foos*.

Similarly, in *Blosser v. Gilbert*, 422 F. App'x 453 (6th Cir. 2011), the Court of Appeals held that the officers were justified in their use of force, in part, because the plaintiff appeared to reach for a weapon in his vehicle.  That case is distinguishable.  There, the officers forcibly removed the plaintiff from his vehicle after he led them on a dangerous car chase, violating numerous traffic laws, "including speeding, driving through stop signs and red lights, and driving the wrong way on a one-way street." *Id.* at 453.  He did not stop until he struck a police car. *Id.* Officers approached him with guns drawn and ordered him to raise his hands. *Id.* at 455.  He did, but then he apparently glanced at his lap and moved his hand toward the door handle. *Id.*  The officers then grabbed him and pulled him out through his open window. *Id.*  The Court of Appeals concluded that the officers were justified in thinking that he might have been reaching for a weapon in the vehicle because (1) he had already "exhibited a disregard for safety and willingness to use his vehicle as a weapon," and (2) his flight from the police suggested "he may have had something to hide[.]" *Id.* at 458.  Unlike the plaintiff in *Blosser*, Weddle did not act in a manner that blatantly disregarded Wiswasser's safety.  Again, she approached Wiswasser for help; she was not fleeing from him.

Finally, in *Wright*, the officers used a taser on the plaintiff because they thought he might be reaching for a weapon.  There, the officers conducted a traffic stop without probable cause to detain or arrest the plaintiff. *Wright*, 962 F.3d at 866.  The plaintiff complied with the officers' commands to shut off his vehicle and put his hands up. *Id.* at 861.  As one officer attempted to put handcuffs on the plaintiff and then pull the plaintiff out of his vehicle, the plaintiff moved his hand toward the center console of the vehicle. *Id.*  The officer claimed that he thought the plaintiff was reaching for a weapon, so he used a taser on the plaintiff. *Id.*  But the plaintiff claimed that his hand movement was not threatening at all; he was simply trying to shift his body so that he could

exit the vehicle. *Id.* The Court of Appeals ultimately determined that "a reasonable jury could find, under the totality of the circumstances, that a reasonable officer would not believe that Wright posed an immediate threat to their safety." *Id.* at 867.

Here, Weddle voluntarily approached Wiswasser for assistance and displayed no signs of aggression or overtly threatening conduct. She repeatedly disobeyed orders to not reach into pockets that were large enough to conceal a weapon, but under the totality of the circumstances construed in Weddle's favor, a jury could find that a reasonable officer in Wiswasser's position would have little reason to believe that she posed an immediate threat to his safety. Thus, this factor weighs in Weddle's favor.

*Resisting*. Finally, the Court must consider whether Weddle was "actively resisting arrest or attempting to evade arrest by flight." *Shreve*, 453 F.3d at 687. Courts distinguish between "active" and "passive" resistance in excessive force cases. *See Goodwin*, 781 F.3d at 325. Generally, the use of force is easier to justify in situations with active resistance, whereas passive resistance, or mere noncompliance, seldom warrants physical force. *See id.* (determining whether use of force was justified by analyzing whether the plaintiff's behavior amounted to active or passive resistance, or noncompliance); *see also Eldridge v. City of Warren*, 533 F. App'x 529, 533 (6th Cir. 2013) (holding that a suspect's failure to comply with officer's demands to get out of his car did not constitute active resistance and thus tasing him was not justified). "[N]oncompliance alone does not indicate active resistance." *Shumate v. City of Adrian*, 44 F.4th 427, 446 (6th Cir. 2022) (quoting *Eldridge*, 533 F. App'x at 534). "Whatever 'active' means, it has to mean something more than mere silence and inaction." *Id.* at 448-49 (quoting *Browning*, 18 F.4th at 526-27). Active resistance "can take the form of 'verbal hostility' or a 'deliberate act of defiance.'" *Goodwin*, 781 F.3d at 323 (quoting *Eldridge*, 533 F. App'x at 534-35). It includes "physically

18

struggling with, threatening, or disobeying officers" and "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Rudlaff v. Gillespie*, 791 F.3d 638, 641 (6th Cir. 2015) (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)).  It also includes "repeated non-compliance," "coupled with . . . arguing with the officers[.]"  *Zuress v. City of Newark*, 815 F. App'x 1, 6 (6th Cir. 2020).

As indicated, Weddle repeatedly disobeyed Wiswasser's multiple commands to stop reaching into her pockets and then verbally refused his commands to exit her vehicle.  This repeated disobedience, coupled with her verbal criticisms ("you don't jump out your gun with me," "don't touch me," "send a state trooper here"), make her conduct look somewhat more like deliberate acts of defiance than passive resistance.  And even if Wiswasser was not arresting or detaining Weddle at that moment, he could reasonably ask her to keep her hands visible in order to ensure a safe interaction between them.

On the other hand, Wiswasser did not tell Weddle that she was under arrest, and she had no apparent reason to think that he was arresting her.  "[T]he general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued, is not told he is under arrest, or is not resisting arrest."  *Goodwin*, 781 F.3d at 326 (quoting *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009)).  Assuming Weddle did not know, or have reason to know, that she was under arrest, this fact weighs against an inference that she was actively resisting one.  *See Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *5 (6th Cir. Mar. 15, 2023) (concluding that the plaintiff "was not actively resisting arrest, particularly considering the plausible inference that he did not know he was being arrested").  Thus, this factor weighs in Weddle's favor.

Because all of the *Graham* factors weigh in Weddle's favor at this stage, the Court finds that Weddle has stated a plausible claim that Wiswasser used excessive force by pulling her from her vehicle and restraining her.

At the next step of the qualified immunity analysis, the Court must determine whether it was clearly established that Weddle had a right not to be pulled out of her vehicle when she was not told she was under arrest, had not committed a crime, but she repeatedly disobeyed the officer's orders to stop putting her hands in her pockets and refused to comply with his commands that she step out of her vehicle.  Weddle makes no attempt to satisfy her burden of overcoming qualified immunity.  Her response brief devotes only three paragraphs to the issue of qualified immunity. She does not discuss the clearly established prong and she identifies no precedent that would have made it clear to a reasonable officer in Weddle's position that he violated her Fourth Amendment protection against the use of excessive force by simply pulling her from her vehicle.  She cites *VanPelt v. City of Detroit*, 70 F.4th 338 (6th Cir. 2023), in which the officer tackled a suspect after he fled from an arrest.  *Id.* at 339.  But there, the Court of Appeals concluded that the officer's use of force was objectively reasonable, so that case does not assist Weddle.  *See id.* at 341. Accordingly, she has not met her burden.  This failure alone warrants granting qualified immunity.

Furthermore, the Court is not aware of applicable precedent.  Other cases that involve officers pulling an individual from a vehicle are distinguishable because they involve greater uses of force than Wiswasser used here.  *See, e.g.*, *Brown*, 779 F.3d at 417 (officers pulled the plaintiff from her vehicle and threw her to the ground); *Foos*, 492 F. App'x at 588-89 (officers used a taser on plaintiff and then pulled him out of the vehicle); *Wright*, 962 F.3d at 866 (same); *Eldridge*, 533 F. App'x at 531 (same); *Blosser*, 422 F. App'x at 459 (officers pulled the plaintiff from his vehicle through his driver-side window); *Folks*, 676 F. App'x at 571 (officer pulled the plaintiff from his

vehicle and slammed him against a windshield). As such, those uses of force were more clearly excessive. Accordingly, Wiswasser is entitled to qualified immunity for this aspect of her excessive force claim.

### 3. Physically assaulting Weddle

Finally, Weddle claims that, after Wiswasser removed her from her car, he "physically assaulted" her. (Compl. ¶ 14.)[4] It is not clear what she means by this vague and conclusory statement, as she provides no facts to support or clarify this assertion, either in her complaint or in her response brief. Also, the video does not depict any obvious use of force by Wiswasser apart from pulling Weddle out of her car, pushing her toward a police cruiser, and helping to secure her in handcuffs.

Weddle does not mention the handcuffing in her complaint, but she can be heard in the body camera video complaining that her cuffs were "too tight." (Body Camera Video 2:16-22.) To the extent excessive handcuffing is what she means by the assault, the law in this Circuit is clear regarding "the prohibition against excessive forceful handcuffing." *Baynes v. Cleland*, 799 F.3d 600, 616-17 (6th Cir. 2015). The claim is sufficiently common that there is a specific framework for analyzing such claims separate from traditional excessive force analysis. To establish excessive force based on overtight handcuffing, the plaintiff must allege that "she complained about the tightness of the handcuffs, the officers ignored her complaint, and the handcuffs caused physical injury." *McGrew v. Duncan*, 937 F.3d 664, 668 (6th Cir. 2019). "Not all allegations of tight handcuffing amount to excessive force." *Lyons v. City of Zenia*, 417 F.3d

---

[4] To be clear, Weddle's allegation of assault is part of her § 1983 claim; she does not raise it as a separate claim under state law.

565, 575 (6th Cir. 2005).  And "a subjective feeling of pain or numbness standing alone does not constitute a physical injury." *Jackson v. Lubelan*, 657 F. App'x 487, 501 (6th Cir. 2016).

Here, Weddle does not allege sufficient factual support for an excessive force claim for excessive handcuffing.  "If a plaintiff's sole allegation is that the cuffs around her wrists were too tight, we need apply only the handcuffing test and our analysis terminates there." *Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021).  Because Weddle does not allege any physical injury and because none can be inferred from the video, she has not plausibly stated a claim of excessive force based on excessive handcuffing.  Accordingly, for all the foregoing reasons, Weddle does not allege a separate excessive force claim based on her allegation of an "assault."

### D. DeWitt Charter Township

Weddle also sues DeWitt Charter Township, Wiswasser's employer.  A municipality like DeWitt Charter Township "may not be held liable under § 1983 on a *respondeat superior* theory— in other words, '*solely* because it employes a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2013) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" *Wright*, 962 F.3d at 879-80 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).  "A plaintiff does this by showing that the municipality had a 'policy or custom' that caused the violation of his rights." *Id*. at 880 (quoting *Monell*, 436 U.S. at 694).

Defendants argue that Weddle's complaint does not identify a policy or custom that is the moving force behind the constitutional violations alleged.  Weddle can demonstrate that DeWitt Charter Township had such a policy or custom in one of several ways.  She may show:

(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the

existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

In her complaint, Weddle makes a conclusory assertion that the township, "acting under color of state law, authorized, tolerated, ratified, permitted, or acquiesced in the creation of policies, practices, and customs, establishing a de facto policy of deliberate indifference to individuals such as Plaintiff." (Compl. ¶ 26.) The only allegation of fact she makes to support this assertion is that "[t]he presence and participation of Sergeant Crawford at the arrest indicates that Defendant DeWitt Township Police Department was not only aware that excessive force was being used to violate Plaintiff's constitutional rights, but also condoned such grossly negligent actions." (*Id.* ¶ 25.)

In her response to Defendants' motion to dismiss, Weddle repeats her refrain that the township "tolerated, ratified, permitted, or acquiesced to [Wiswasser's] conduct." (Pl.'s Resp. Br. 6, ECF No. 13.) She reasons that, because Wiswasser "was not reprimanded for [using excessive force], the Court may infer that [he] was acting pursuant to Township policy, practice, or custom." (*Id.*) However, Weddle's complaint contains no allegation that the township did not reprimand Wiswasser.

But even if the complaint contained this additional allegation, it would not save her claim against the township because Weddle does not allege facts that would suffice to establish a custom or policy under any of the four methods identified above. First, she does not identify an official policy. Second, she does not identify an official with policy-making authority who ratified any of the conduct by Wiswasser (she does not allege that Crawford was such an official). Third, she does not allege facts from which to infer inadequate training or supervision by the township. And

finally, she does not allege facts from which to infer that the township had a custom of tolerance of federal rights violations.

The failure to reprimand Wiswasser would not suffice to establish municipal liability because the township's "after-the-fact approval . . . , which did not itself cause or continue a harm against [a plaintiff], [is] insufficient to establish [a] *Monell* claim." *Burgess*, 735 F.3d at 479. In other words, Weddle cannot sustain a claim against DeWitt Charter Township for its failure to punish Wiswasser for the very event about which she complains, because that failure to punish cannot have been a cause of Weddle's injury.

Moreover, the township's purported failure to reprimand Wiswasser for this single incident involving Weddle would not plausibly suggest a *custom* or *policy* of tolerating federal rights violations. To make the latter showing, Weddle would have to allege

> (1) a clear and persistent pattern of unconstitutional conduct by municipal employees; (2) the municipality's notice or constructive notice of the unconstitutional conduct; (3) the municipality's tacit approval of unconstitutional conduct such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction; and (4) that the policy of inaction was the moving force of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the municipality rather than simply by the conduct of the municipal employee.

*D'Ambrosio*, 747 F.3d at 387-88 (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996) (internal quotation marks omitted)). But Weddle does not allege a pattern of unconstitutional conduct, let alone notice by the township of such a pattern. She alleges only one incident of unconstitutional conduct. Crawford's presence at the scene of that incident does not suggest either a pattern of unconstitutional conduct or notice by the township.

In effect, Weddle asks the Court to infer that the township is liable under §1983 because one of its employees allegedly violated her constitutional rights in the presence of another employee. Permitting Weddle's claim to proceed on these facts would amount to *respondeat*

*superior* liability for the township.  *Monell* requires more.  Accordingly, the Court will dismiss DeWitt Charter Township for failure to state a claim.

## IV. CONCLUSION

For the reasons stated above, the Court will grant Defendants' motion to dismiss in part and deny it in part.  The Court will dismiss the Eighth Amendment claims and Fourteenth Amendment claims (equal protection and substantive due process) for failure to state a claim.  The Court will dismiss DeWitt Township Police Department and DeWitt Charter Township for failure to state a claim.  The Court will dismiss the Fourth Amendment claim regarding Defendant Wiswasser's "assault" for failure to state a claim.  The Court will grant qualified immunity to Wiswasser for the excessive force claim stemming from pulling Weddle from her vehicle.  The Court will not dismiss the excessive force claim against Wiswasser stemming from his use of his firearm.  And at this stage, the Court will not grant Wiswasser qualified immunity for the claim regarding the firearm.

The Court will enter an order consistent with this Opinion.

Dated: February 5, 2024                    /s/ Hala Y. Jarbou
                                           HALA Y. JARBOU
                                           CHIEF UNITED STATES DISTRICT JUDGE