UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNETTE WEDDLE,

    Plaintiff,

v.

DEWITT CHARTER TOWNSHIP, et al.,

    Defendants.
_____/

Case No. 1:23-cv-714

Hon. Hala Y. Jarbou

## OPINION

Plaintiff Lynette Weddle brought this civil rights action under 42 U.S.C. § 1983 against police officer Andrew Steven Wiswasser and others. After Defendants filed a motion to dismiss for failure to state a claim, the Court dismissed all Defendants and claims other than Weddle's claim that Wiswasser used excessive force in violation of the Fourth Amendment when he brandished his firearm at her. (2/5/2024 Op. 12-14, 25, ECF No. 26.) Before the Court is Wiswasser's motion for summary judgment on that claim (ECF No. 37). For the reasons herein, the Court will grant the motion and dismiss the case.

### I. BACKGROUND

**A. Summary**

On January 26, 2022, Weddle called 911 and reported an incident involving her ex-boyfriend, Charles Baker, while the two had been out together at a restaurant, eating and drinking alcohol. Weddle and Baker had a history of domestic disputes where the police had been called to intervene. Defendant Wiswasser, a local police officer for DeWitt Charter Township, had responded to several of those incidents, including one at Baker's address where Baker claimed that Weddle had attempted to run him over with her vehicle. While Weddle was still on the phone,

Baker and Weddle left the restaurant in Baker's vehicle and then he dropped her off at his place, where she retrieved her car and left. She remained on the phone as authorities tracked her location. She answered few of the 911 operator's questions and gave little information, but Wiswasser suspected it was her and parked his cruiser by a road he thought she would use to return home. His suspicions proved correct. She took the road where Wiswasser was waiting. Seeing his vehicle, she pulled off the road and parked parallel to him. As she was pulling up, Wiswasser recognized her and stepped out of his vehicle with his firearm drawn. She claims that this use of his firearm was unreasonable and excessive.

Later in their interaction, Wiswasser pulled Weddle out of her vehicle after she repeatedly defied his orders to stop reaching into the pockets of her coat. He placed her under arrest and she was charged with resisting or obstructing a police officer and driving without insurance. Wiswasser testified at the preliminary examination hearing for those charges. Weddle eventually pleaded guilty to disorderly conduct.

### B. Procedural History

In its previous opinion, the Court concluded that, based on the facts alleged in the complaint, Weddle had stated a viable excessive force claim regarding his use of his firearm and that Wiswasser was not entitled to qualified immunity for that claim. (2/5/2024 Op. 12-14.) The parties have since engaged in discovery and Wiswasser now seeks summary judgment on that claim.

## II. STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

### B. Qualified Immunity

Wiswasser argues that he is entitled to qualified immunity. "At summary judgment, a government official is entitled to qualified immunity unless the evidence, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that '(1) the defendant violated a constitutional right; and (2) the right was clearly established.'" *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680-81 (6th Cir. 2013)). "If either prong is not met, then the government officer is entitled to qualified immunity." *Doe v. Mia. Univ.*, 882 F.3d 579, 604 (6th Cir. 2018).

For the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Although 'a case directly on point' is not necessary to overcome qualified immunity, 'existing precedent must have placed the . . . constitutional question beyond debate.'" *Linden v. City of Southfield*, 75 F.4th 597, 602 (6th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[I]n the excessive force context, where the scope of the right is highly fact-dependent, the Supreme Court has stressed the importance of identifying controlling precedent where the factual circumstances are specific enough to 'give fair and clear warning to officers' that particular conduct violates the law." *Heeter v. Bowers*, 99 F.4th 900, 915

3

(6th Cir. 2024) (quoting *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (internal quotation marks omitted)).

Once the qualified immunity defense is raised, the "plaintiff bears the burden of overcoming qualified immunity." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021). That burden includes "pointing to legal authority that clearly shows that the constitutional question . . . should be resolved in [the plaintiff's] favor." *Linden*, 75 F.4th at 604.

### III. EVIDENCE

The following is a summary of the facts, construing the evidence in Weddle's favor.

#### A. Weddle Calls 911 to Report Domestic Violence

On January 26, 2022, Weddle was out having lunch with her former boyfriend, Charles Baker. (Weddle Dep. 50, ECF No. 38-3.) He had several drinks; she had one. (*Id.* at 51.) They got into an argument. When she got up to leave, he became upset. (*Id.* at 50.) She went to his car. After he entered the car, he "went to get physical with" her. (*Id.*) She called 911 and told the operator that she had a personal protection order ("PPO") against Baker, that he had been drinking, and that he was acting "violent" toward her. (*Id.* at 52.)

#### B. Wiswasser Hears Details about the 911 Call

According to a recording of radio traffic between a 911 operator/dispatcher, Wiswasser, and other officials, the operator reported a call from an unidentified female (i.e., Weddle) involving "unknown trouble"; the female reported that she was in a vehicle and her companion was drunk but she was not "saying what's going on." (Audio of Radio Traffic, ECF No. 38-4.) She provided a street address, though it was not clear to the operator why she had done so. The operator said it was hard to understand her because the caller had screamed and there was yelling or screaming in the background.

Someone else reported over the radio that the address given by the caller had a history of "unknown troubles, felonious assault, neighbor disputes, animal complaints, [and] breaking and entering." The operator then reported that the caller was being "totally uncooperative"; she was speaking without answering questions. The caller said she was in a black Denali vehicle.

**C. Wiswasser Knew Weddle from Prior Interactions**

Wiswasser suspected that the caller was Weddle and that she was with Baker because he knew Weddle and Baker from previous interactions. In 2018, he responded to "a domestic violence situation" involving Weddle and Baker. (Weddle Dep. 32, 34-35.) Baker had accused her of trying to run him over with her car. (*Id.* at 34-35; Wiswasser Aff. ¶ 6, ECF No. 38-2, PageID.365-368.) Wiswasser arrested her for felonious assault. (Weddle Dep. 44; Wiswasser Aff. ¶ 6.) She had been drinking when the incident occurred. (*Id.* at 35.)

In 2019, Wiswasser responded to Baker's home after Baker called to report that Weddle was violating a PPO barring contact between them. (*Id.* at 39-40.) According to Weddle, she went to Baker's house and then he became "aggressive and dominating" with her after she refused to have sex with him. (*Id.* at 40-41.) Wiswasser and another officer escorted Weddle off of Baker's property. (*Id.* at 40.) Both Baker and Weddle had been drinking alcohol before their dispute. (*Id.* at 41.) They "drank all the time" when together. (*Id.* at 43.)

In these interactions, Weddle displayed "volatile and unpredictable behavior" toward Wiswasser. (Wiswasser Aff. ¶ 6.) Weddle does not offer evidence to dispute this characterization. She does acknowledge that she has bipolar disorder, schizophrenia, and anxiety, which cause mood swings, hallucinations, "different personalities," and anxiety attacks (Weddle Dep. 9, 14-15), but she argues that Wiswasser was not aware of these issues and did not mention them until after she gave her deposition in this case. He did not refer to them in his incident report or in his preliminary examination testimony. Thus, whether Wiswasser was aware of her mental health problems is

arguably in dispute. For this Opinion, the Court will assume Wiswasser was not aware of her mental health diagnoses. On the other hand, her volatile and unpredictable behavior toward Wiswasser is not disputed.

Over the radio, Wiswasser verbalized his suspicion that he knew the identity of the caller, saying that the black Denali was "what they were in when I arrested her for felonious assault." (Audio of Radio Traffic.)

### D. Weddle Embarks In Her Own Vehicle

After following the movements of the black Denali, an operator reported over the radio that the female caller was now in her own vehicle, but she would not answer questions. She was refusing to stop or to give her location over the phone.

### E. Wiswasser Waits for Weddle Along a Route She Used in the Past

Wiswasser radioed that he was waiting for the caller near a location "where she came the last couple times." (*Id.*) He had pulled off the road by a gravel pit and waited for Weddle to pass by. The video from his body camera shows what happened next.

### F. Weddle Approaches and Turns to Park Near Wiswasser

As Wiswasser sat in the driver's seat of his cruiser, which faced the road, Weddle's vehicle came into view at one end of the road. He knew that it was her car because he recognized it. (Wiswasser Aff. ¶ 7.) He observed that she was speeding. (*Id.*) She was driving 5 miles per hour over the 45 mile-per-hour speed limit. (*See* Weddle Dep. 64; Prelim. Exam. Hr'g Tr. 39, ECF No. 38-6.)

When Weddle reached Wiswasser's location, she turned off the road and parked parallel to him with her driver's side door facing his. (*See* Body Camera Video 13:15:43, ECF No. 10.)[1]

---

[1] The Court's time reference is based on the time stamp in the video.

He claims that she "made a quick approach and abrupt stop" (Wiswasser Aff. ¶ 7(f)), but a jury could conclude otherwise from the video. In the video, her turn and stop appear to be relatively slow and controlled.

### G. Wiswasser Exits His Cruiser and Draws His Firearm

Just before Weddle turned off the road toward Wiswasser, he opened his door partway. He then unholstered his firearm while exiting his vehicle. (*See* Wiswasser Aff. ¶ 7.) Weddle saw him "getting out of his car with . . . his hand on his gun, drawing his gun." (Weddle Dep. 61.) She says he "jumped out the car with his gun drawn at [her]." (*Id.*)

### H. Weddle Brandishes His Firearm for Up to 13 Seconds

The gun is not visible at any point in the video, and neither are Wiswasser's hands for the most part. Both of his hands become visible when he reached toward her car door after she parked. At that point, there was no weapon in his hands. Weddle says he drew the firearm on her or at her. It is not clear whether this means he pointed it directly at her. There is a possibility that he did so, but at no time did he raise it to his chest or shoulder level and point it at her; if he had done the latter, that action would have appeared in the video.

Construing the video evidence in Weddle's favor, the earliest she could have seen him with his hand on his weapon is at about 13:15:39 in the video, as she was starting to turn off the road. At that point, Wiswasser had opened his door partway. Although his door and vehicle were still blocking her line of sight to most of his body, there is a possibility she might have seen him holding a firearm by looking through his door window or through the space between his partly open door and his cruiser. She then pulled her vehicle to a stop and parked about 10 feet away from him. As indicated, both of his hands become visible at 13:15:52, when he approached her and raised his hands to stop her from opening her door. There is no weapon in his hands at that point.

7

Accordingly, the total amount of time that he could have brandished his weapon at Weddle was, at most, about 13 seconds.

During those 13 seconds, Weddle brought her car to a stop with her phone in hand and told Wiswasser through her open window that she was on a call with 911.  (Body Camera Video 13:15:49.)  Meanwhile, Wiswasser opened his door further and stepped toward her.  He asked, "Yeah, but why aren't you pulling over for them?"  As she started to explain, she pushed her door partway open and he responded by putting his hands forward, stopping her door with his left hand.  (*Id.* 13:15:52.)

### I. Weddle and Wiswasser Comment on His Firearm Use

After that 13-second time period, he asked, "Whoa, what are you doing?  Hold on here.  Settle down."  (*Id.* 13:15:52-54.)  She responded, "Yeah, because you don't jump out your gun with me like that."  (*Id.* 13:15:58.)  He told her, "When you come pulling up on me like that, I certainly will."  (*Id.* 13:16:00.)

The rest of their interaction is largely irrelevant to Weddle's claim, as it does not involve his use of a firearm.  By way of background, however, Wiswasser ultimately pulled Weddle out of her vehicle and arrested her after she repeatedly defied his commands to stop reaching into her coat pockets.  (*See* 2/5/2024 Op. 2-4, ECF No. 26.)  She was later charged with resisting and obstructing a police officer.

### J. Wiswasser Provides Reasons for His Use of Force

After his interaction with Weddle, Wiswasser prepared an incident report describing what happened and giving reasons for his use of force. (Incident Rep., ECF No. 38-2, PageID.370-373.) He claimed that she pulled in next to him in a "quick, abrupt, and aggressive" manner and noted her "assaultive past" and history of making "irrational decisions without warning."  (*Id.*,

8

PageID.371.) He reported that he "jumped" out of his vehicle and unholstered his pistol due to the "man[ner] in which she pulled in." (*Id.*)

Wiswasser provided additional reasons at a preliminary examination hearing for Weddle's criminal charges. He testified that he immediately jumped out of his car and unholstered his firearm "based off of [his] previous encounters . . . with Weddle and Baker . . . and the manner in which she pulled in." (Prelim. Exam. Hr'g Tr. 10.) She "pulled up on [him] door-to-door, limiting [his] capabilities of what [he] could do[.] [W]ith the approach on her and the fact that [he was] investigating domestic violence at that point[,] [he] had limited spots that [he] could move." (*Id.*) He pushed her door closed because he had "wanted her to remain in that car until [he] had a second officer there . . . based off some previous experiences that [he'd] had with her." (*Id.* at 11.)

## IV. ANALYSIS

### A. Law of the Case

Weddle argues that Wiswasser's motion is misguided because the Court has already ruled that she states a viable claim for excessive force and that Wiswasser is not entitled to qualified immunity for that claim. She characterizes his motion as an improper appeal of this Court's previous opinion denying his motion to dismiss the excessive force claim regarding his use of his firearm. She contends that the Court's previous opinion provides the law of the case that binds the parties and this Court going forward.

Weddle is mistaken. She misunderstands the difference between a motion to dismiss and a motion for summary judgment. For a motion to dismiss, the Court must accept the allegations of the complaint as true and decide whether it states a claim based solely on those allegations and a few other pieces of evidence, such as video of the incident, "exhibits attached to the complaint, public records, [and] items appearing in the record of the case." *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). In contrast, when reviewing a motion for summary judgment, the Court does

9

not look at the complaint. Instead, it considers evidence presented by the parties. That evidence may reveal that the underlying facts are different from what was depicted in the complaint.

Here, for instance, Weddle's complaint does not contain any information about her previous interactions with Wiswasser. As discussed below, those interactions are relevant to the extent they provided him with information about the potential threat Weddle posed as she drove up to him. The greater the threat she posed, the more reasonable it was for Wiswasser to use some force to protect himself from it. Accordingly, the Court's previous opinion does not control the outcome of Wiswasser's current motion. Rather, the Court must evaluate the reasonableness of his use of force and his qualified immunity defense anew in light of the new evidence now available to the Court.

**B. Excessive Force**

The Fourth Amendment prohibits police officers from using excessive force when making arrests. In determining whether an officer's use of force was excessive, the Court asks whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989) (quotation marks omitted)). The Court must evaluate each case in its own context, considering factors such as the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] is actively resisting arrest or attempting to evade arrest by flight." *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). These three factors from *Graham* are not exhaustive. *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). "The ultimate question . . . is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Kent*, 810 F.3d at 390 (quoting *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005)).

10

This Court must focus on the "reasonableness at the moment of the use of force, as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vison of hindsight." *Id.* (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 320 (6th Cir. 2015) (quotation marks omitted)). The Court must also account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

Where the officer's use of force is brandishing a firearm, precedent makes clear that "a police officer may approach a suspect with a weapon drawn during a [traffic] stop when the officer reasonably fears for his safety." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020). Conversely, "[a]n officer's decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain a claim of excessive force." *Id.* at 866 (quoting *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) (collecting cases)).

Applying the three *Graham* factors, the reasonableness of Wiswasser's use of force is a close call.

### 1. Severity of the Crime

Weddle acknowledges that she was driving a little over the speed limit when she approached Wiswasser, which is not a serious crime. Wiswasser argues that he had reason to believe that Weddle may have been the perpetrator of domestic violence, which is a serious crime. He notes the following: the caller had reported a domestic situation between her and her companion; the details of the situation were unclear; Wiswasser was aware of Weddle's past interactions with Baker; and she was not being cooperative with the 911 operator. But a jury could conclude such a belief was not reasonable under the circumstances. For one thing, the radio traffic does not mention any physical violence or assault. For another, the operator reported that a female

11

(Weddle) made the 911 call; it is unlikely that she did so to report her own violent behavior. Also, Weddle pulled over and stopped when she saw Wiswasser, which suggests she was looking for his help or protection, rather than attempting to escape the consequences of her own bad acts. Thus, this factor weighs in her favor.

### 2. Resisting or Attempting to Evade Arrest

Weddle was not resisting or attempting to evade arrest when she drove up to Wiswasser's vehicle, and Wiswasser was not attempting to arrest her. This factor also weighs in Weddle's favor.

### 3. Threat to Safety

As evidence of a threat to Wiswasser's safety, he points to Weddle's volatile and unpredictable behavior toward him in the past, her erratic and assaultive behavior toward Baker in the past (e.g., violating a PPO and purportedly assaulting Baker), and her unusual behavior at the time of the incident in question (not stopping her vehicle or responding to questions posed by the 911 operator). Notably, her assaultive conduct in the past apparently involved using a vehicle to try to run over Baker. Weddle contends that she did not try to harm Baker; rather, she was simply trying to escape from him in her vehicle. (Weddle Dep. 34.) However, she offers no evidence from which to infer that Wiswasser was aware of her version of that incident. Thus, Wiswasser could have reasonably believed she had used her vehicle to attempt to harm Baker. If Weddle tried to do the same to Wiswasser, he would not have been safe from such an assault, even while inside his cruiser. And because of where he was parked—by a lake and a gravel pit—"he had limited spots" to move. (Prelim. Exam. Hr'g Tr. 9-10.)

In addition, a reasonable officer in Wiswasser's position could have suspected that Weddle had been drinking. The operator reported that Baker had been drinking and Wiswasser knew from past interactions with Weddle and Baker that their domestic disputes arose in the context of alcohol

12

consumption by the two of them.  The addition of alcohol to the mix increased the possibility of irrational behavior by Weddle.

The threat factor weighs slightly in Wiswasser's favor.  There were a few indicators that Weddle's behavior on the date at issue was erratic and unpredictable.  Also, she had a known history of erratic and assaultive behavior in similar circumstances—i.e., a domestic dispute with Baker involving alcohol consumption.  On the other hand, there were no facts suggesting she had acted violently on that particular date, and there was little to suggest that she might act in such a manner toward Wiswasser.  However, the risk at issue was the possibility that she might assault Wiswasser, perhaps by using her vehicle.  That risk seems remote, but there was a justifiable basis for perceiving it.

On balance, the *Graham* factors tend to favor Weddle.  She was not under arrest or fleeing arrest.  She had not committed a serious offense.  There was reason for Wiswasser to believe Weddle might pose a safety risk, though the risk to Wiswasser was somewhat small.

The Court must also consider the extent of the force used to determine whether that force was reasonable under all the circumstances.  Here, the force Wiswasser used was relatively slight.  Construing the evidence in the light most favorable to Weddle, he brandished his weapon at her for a few seconds.  During that time, he did not issue any orders or make any demands, which would have increased the threat conveyed by his use of force.  *See Wright*, 962 F.3d at 869 ("[P]ointing a firearm at an individual and making a demand of that individual . . . communicates the implicit threat that if the individual does not comply with the . . . demands, the [one pointing the firearm] will shoot the individual." (quoting *Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019))).

Also, recall that he drew his firearm as she was still pulling up. Before she stopped, it was not clear what her intentions were. He knew about her assaultive history and erratic behavior. He also knew that she had not been responsive on the phone. He had not yet had the opportunity to observe her demeanor or to question her himself. The Court must account for the uncertain and evolving situation that he faced and not judge his decision with the benefit of hindsight.

Based on all the foregoing, the Court finds that the reasonableness of Wiswasser's conduct is a close question. But viewing the record in the light most favorable to Weddle, a reasonable juror could conclude that his use of force was excessive. *See id.* at 866 (concluding, in that case, that a jury had to determine whether the officers' decision to conduct a traffic stop with weapons drawn was excessive). One fact that remains in dispute is whether Weddle drove up on Wiswasser in a threatening manner, as he contends. The body camera video does not definitively resolve that dispute. Viewed it in a light most favorable to Weddle, the video does not support Wiswasser's contention, but it does not conclusively rule it out either. Because a video tends to flatten an image and reduce depth, it is difficult to judge from the video alone the speed of Weddle's vehicle, her trajectory, and her distance from Wiswasser as she approached and turned toward him. A reasonable juror could potentially side with him on this issue.

### C. Qualified Immunity

At any rate, the Court agrees with Wiswasser that he is entitled to qualified immunity. Even if a jury could conclude that the total circumstances Wiswasser faced did not justify his show of force, the Court is not persuaded that it would have been clear to a reasonable officer in his position that "his conduct was unlawful in the situation he confronted." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Saucier*, 533 U.S. at 202).

Weddle's only response to Wiswasser's qualified immunity defense is that the Court previously determined that he is not entitled to qualified immunity. In other words, Weddle relies

solely on the Court's previous opinion. As discussed above, that opinion does not control here. That opinion did not evaluate Wiswasser's right to qualified immunity in light of the evidence now before the Court. Consequently, Weddle has not satisfied her burden of overcoming Wiswasser's qualified immunity defense, including her burden of identifying relevant case law applicable to the facts at hand.

Assuming Weddle relies upon the cases cited by this Court in its previous opinion, those cases do not adequately support her position. In *Wright*, the Court of Appeals held that it is "clearly established . . . that brandishing a firearm without a justifiable fear that [the suspect] was fleeing or dangerous [is] unreasonable and constitute[s] excessive force." *Wright*, 962 F.3d at 870. Unlike the officers in *Wright*, however, Wiswasser had reason to believe that Weddle posed a risk to his safety. The officers in that case approached the plaintiff with weapons drawn while he was in a parked vehicle. *Wright*, 962 F.3d at 861. All they knew about the plaintiff was that he had briefly visited a house where there was suspected drug activity. *Id.* In contrast, Wiswasser knew Weddle and her prior behavior, which gave him reason to be fearful of her assaultive and unpredictable conduct.

Similarly, other cases in this Circuit involving an officer's unreasonable brandishing of a firearm are distinguishable. In *Binay v. Bettendorf*, 601 F.3d 640 (6th Cir. 2010), the officers held the plaintiffs at gunpoint for an hour while searching the plaintiffs' premises and interrogating them, even though the plaintiffs were handcuffed and cooperative throughout that time. *Id.* at 648. That use of force was far greater than what Wiswasser used here, and unlike Weddle, the suspects there clearly posed no threat while restrained in handcuffs.

In *Davis v. Bergeon*, No. 98-3812, 1999 WL 591448 (6th Cir. July 27, 1999), an officer inspecting a restroom pointed her weapon at the plaintiff and ordered him to get on the floor. *Id.*

15

at *5. At the time, the plaintiff was simply attempting to use the restroom; he was not suspected of any wrongdoing and there was no reason to believe he posed a threat to anyone's safety. *Id.* In contrast, Wiswasser had reason to believe Weddle posed a risk to his safety. Also, unlike the officer in *Davis*, Wiswasser did not issue any orders to Weddle while brandishing his firearm. Thus, he did not communicate the same level of threat to Weddle that the officer in *Davis* communicated to the plaintiff in that case. *Cf. Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) (finding no Fourth Amendment violation where officers initially approached a premises to be searched with guns drawn but did not "use[] their weapons in a threatening manner").

"'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quoting *al-Kidd*, 563 U.S. at 743). *Dorsey v. Barber*, 517 F.3d 389 (6th Cir. 2008), another case involving an officer's decision to brandish a firearm, is distinguishable but instructive. There, the officer drew his firearm on two suspects and ordered them to lie on the ground for two minutes, despite their "unsuspicious, nonthreatening behavior." *Id.* at 399, 402. The Court of Appeals agreed that these actions were "at least arguably unreasonable." *Id.* at 400. However, the court concluded that the officer was entitled to qualified immunity because, among other things, he knew the suspects were wanted for arrest but did not know the seriousness of their offenses. *Id.* Also, the suspects initially disregarded and resisted his orders to stop while in a crowd of people. The officer "chose to stabilize the situation by acting with a preemptive show of authority." *Id.* The court concluded that the officer's use of force was not "so egregious as to suggest outright incompetence." *Id.* At worst, it was "an error of judgment, erring on the side of public safety." *Id.*

Similarly, this Court cannot conclude that Wiswasser's brief display of his firearm as a show of force toward Weddle was so egregious or plainly incompetent that it falls outside the protection of qualified immunity. He had reason to believe that Weddle was a threat to his safety. His level of concern may have been unwarranted, rendering his brief show of force unnecessary and unreasonable, but at worst, he made a mistake in judgment, erring on the side of personal safety. Under the circumstances, his mistake was not one that a reasonably competent officer in his position would have known was a violation of Weddle's constitutional rights. Thus, he is entitled to qualified immunity.

## V. CONCLUSION

For the foregoing reasons, the Court will grant Wiswasser's motion for summary judgment and dismiss the remaining excessive force claim against Wiswasser because he is entitled to qualified immunity.

The Court will enter an order consistent with this Opinion. Because that order will resolve the only remaining claim, the Court will enter a judgment dismissing the case.

Dated: November 19, 2024           /s/ Hala Y. Jarbou
                                   HALA Y. JARBOU
                                   CHIEF UNITED STATES DISTRICT JUDGE